**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MICHAEL MANTAGAS,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **SHI INTERNATIONAL CORP.**, <br><br> Defendant. | Civil Action No. 22-6739 (ZNQ) (TJB) <br><br> **OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendant SHI International Corp. ("Defendant"). ("Motion", ECF No. 17.) Defendant filed a brief in support of its Motion. ("Moving Br.", ECF No. 17-1.) Plaintiffs Michael Mantagas and Michael Robina, on behalf of themselves and all others similarly situated, filed an Opposition to Defendant's Motion ("Opp'n", ECF No. 18) to which Defendant replied ("Reply", ECF No. 19.) The Court will also address Defendant's request to Compel Arbitration incorporated into its Motion to Dismiss.

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT-IN-PART and DENY-IN-PART Defendant's Motion to Dismiss.

1

**I.      BACKGROUND AND PROCEDURAL HISTORY**

Defendant removed this action from the Superior Court of New Jersey, Law Division, Somerset County. (ECF No. 1.)  On August 24, 2022, Plaintiffs filed their Complaint on behalf of a putative class in connection with a data breach suffered by Defendant for "at least 11,000 persons whose data was compromised in [the] Data Breach." ("Compl.", ECF No. 1-1.)  Defendant is an international provider of information technology services, which held in its possession certain personally identifiable information ("PII") and private health information ("PHI") (collectively, "Personal Information") of Plaintiffs and the putative Class Members. (*Id.* ¶ 1.)  Defendant offers the full spectrum of IT solutions, including IT lifecycle services, data centers, cloud computing, data management, professional and technical training, digital infrastructure, and most pertinently, cybersecurity solutions.  (*Id.* ¶ 22.)  "Plaintiffs' and Class Members' sensitive Personal Information—which was entrusted to Defendant—was compromised and unlawfully accessed due to [a] Data Breach."  (*Id.* ¶ 2.)  "According to the Notice of Data Breach letter ("Notice") that Defendant sent to state Attorneys General, the private information compromised in the Data Breach included at least full names, Social Security numbers, home addresses, job titles, dates of employment, salary, tax, banking and loan information, and employees' COVID-19 vaccination status and dates of COVID-19 illness" (collectively "Private Information"). (*Id.* ¶ 3.)  "The Private Information compromised in the Data Breach was exfiltrated by the cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals" and "was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect employees' Private Information." (*Id.* ¶¶ 4–5.)

In the Notice letters sent to Plaintiffs on July 27, 2022, Defendant admits that it discovered "unauthorized access to its computer systems" and that employee data was "compromised." (*Id.*

¶ 32.) Defendant "disclosed the Data Breach's occurrence on July 6, 2022[,] but did not begin noticing Plaintiffs . . . until July 27, 2022." (*Id.* ¶ 34.) Plaintiffs allege that due to "this targeted cyberattack, data thieves were able to gain access to and obtain data from [Defendant] that included the Private Information of Plaintiffs." (*Id.* ¶ 39.) Defendant "could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII." (*Id.* ¶ 43.)

Defendant's webpage is replete with warnings regarding the frequency and severity of cyberattacks and the consequences that result from failures to implement proper data security practices and further acknowledges the need for companies to protect employees and company assets. (*Id.* ¶¶ 23–24.) Defendant also "had obligations created by contract, industry standards, and common law to keep Plaintiffs' . . . Private Information confidential and to protect it from unauthorized access and disclosure." (*Id.* ¶ 45.) "Unfortunately for [Defendant]'s employees, . . . [Defendant] failed to adequately protect their Private Information from threats known to and anticipated by it" despite its promises to provide confidentiality and adequate security for employee data. (*Id.* ¶¶ 25–26.) Plaintiffs relied on these promises to keep their sensitive Private Information confidential and securely maintained and provided Defendant with—among other sensitive information—their names, dates of birth, Social Security numbers, driver's license numbers, medical, and health insurance information. (*Id.* ¶¶ 28–29.) Defendant also aggregated and maintained information developed during the course of the employment relationship like job titles, dates of employment, salary, tax, and banking and loan information. (*Id.* ¶ 30.) By obtaining, collecting, and using this Private Information, Defendant "assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure." (*Id.* ¶ 50.) This is especially the case in light of

recent high profile data breaches at other industry leading companies.  (*Id.* ¶ 57.)  Plaintiffs took reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained.  (*Id.* ¶¶ 51–52.)

Although Defendant had the resources necessary to prevent the Data Breach, it neglected to adequately implement them and invest in security measures commensurate with the foreseeable risk involved.  (*Id.* ¶ 62.)  Defendant also failed to comply with industry standards on securing PII and ran afoul of the Federal Trade Commission's guidelines on security standards.  (*Id.* ¶¶ 77, 87.)  Defendant therefore "breached its obligations to Plaintiff[s] . . . or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems, networks, and data."  (*Id.* ¶ 91.)  As a result, "Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft.  Plaintiffs have also incurred (and will continue to incur) damages in the form of loss of privacy and costs of responding to the Data Breach including engaging adequate credit monitoring and identity theft protection services."  (*Id.* ¶ 96.)  Specifically, Plaintiff Mantagas alleges that he experienced an increase in the number of spam phone calls, emails, and texts, in particular emails related to payday loans following the Data Breach.  (*Id.* ¶ 111.)  On the other hand, Plaintiff Robina's credit card information was used to make fraudulent charges following the Data Breach.  (*Id.* ¶ 121.)

Defendant also failed to give timely and accurate notice of the Data Breach as the breach was discovered on July 4, 2021, but notice was not sent out until July 27, 2022.  (*Id.* ¶ 46.)  Defendant's notice is further incomplete and misleading as it does not disclose the specific information pertaining to each Class Member that was accessed in the Data Breach, the precise means of the attack, and whether Plaintiffs' Private Information is still in the hands of the attackers.  (*Id.* ¶ 47.)  To date, Defendant has offered its employees whose data was compromised, only two

4

years of credit monitoring. (*Id.* ¶ 75.) Plaintiffs' Complaint alleges Negligence (Count I), Breach of Implied Contract (Count II), Unjust Enrichment (Count III), and Invasion of Privacy (Count IV). (ECF No. 1-1.)

## II.     JURISDICTION

The Court has original jurisdiction over Plaintiffs' claims under the Class Action Fairness Act of 2005 because the number of members of all proposed plaintiff classes in the aggregate is at least 100, there is at least partial diversity between the parties, and the aggregated claims of the class members exceed the sum or value of $5,000,000, exclusive of interest and costs.  28 U.S.C. § 1332(d).

## III.    LEGAL STANDARD

### A.     RULE 12(b)(1)

Under Rule 12(b)(1), a court may dismiss a claim if it lacks subject-matter jurisdiction. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).  A Rule 12(b)(1) motion can raise a facial attack or a factual attack, which determines the standard of review. *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).  A facial attack "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law . . . or because some other jurisdictional defect is present." *Id.* at 358.  In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff. *Id*.  A "factual attack concerns the actual failure of [plaintiff's] claims to comport with the jurisdictional prerequisites." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008); *see id.* ("So, for example, while diversity of citizenship might have been adequately pleaded by the plaintiff, the defendant can submit proof

that, in fact, diversity is lacking.")  When considering a factual challenge, "the plaintiff [has] the burden of proof that jurisdiction does in fact exist," the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to [the] plaintiff's allegations . . . ." *Mortenson v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

  **B.** **RULE 12(b)(6)**

  Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted).  Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

  However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545.  The complaint must include "enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a

reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and internal quotation marks omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim.  The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and internal quotation marks omitted)).

In sum, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotation marks omitted).  Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. (internal quotation marks omitted).  Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. (internal quotation marks and brackets omitted).

IV. **DISCUSSION**

    A. **MOTION TO COMPEL PLAINTIFF ROBINA TO ARBITRATION**

Defendant moves to compel Plaintiff Robina to arbitrate his claims pursuant to an Arbitration Agreement he signed in 2021.  (Moving Br. at 23–24.)  In his Opposition, Robina argues that the Arbitration Agreement is unenforceable because the event underlying this suit—the Data Breach—occurred almost nine months after he resigned from his employment with Defendant. (Opp'n at 28.)  Robina also argues that he did not agree to arbitrate claims arising out of the Data Breach and that, even if he did, the Arbitration Agreement is substantively unconscionable and therefore unenforceable.  (*Id.*)

"The FAA federalizes arbitration law and 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate . . . .'" *John Hancock Mut. Life Ins. Co. v. Olick,* 151 F.3d 132, 136 (3d Cir. 1998) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)). Courts are authorized to compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. Additionally, under § 3 of the FAA, parties may "apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.'" *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting 9 U.S.C. § 3).

When deciding a motion to compel arbitration, a court must ascertain whether "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Aetrex Worldwide, Inc. v. Sourcing for You Ltd.*, 555 F. App'x 153, 154 (3d Cir. 2014) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)). To conduct this inquiry, the court shall apply "ordinary state-law principles that govern the formation of contracts." *Kirleis*, 560 F.3d at 160 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

In determining whether a valid arbitration agreement exists, a court must first decide whether to use the Rule 12(b)(6) or Rule 56 standard of review. *See Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015). The Rule 12(b)(6) standard applies when arbitrability is "apparent, based on the face of a complaint, and documents relied upon in the complaint[.]" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (internal quotation marks omitted). However,

> [w]here the complaint does not establish with clarity that the parties have agreed to arbitrate, or when the party opposing arbitration has

8

> come forward with reliable evidence that it did not intend to be bound by an arbitration agreement, a Rule 12(b)(6) standard is not appropriate because the motion cannot be resolved without consideration of evidence outside the pleadings, and, if necessary, further development of the factual record.

*Noonan v. Comcast Corp*, Civ. No. 16-458, 2017 WL 4799795, at *4 (D.N.J. Oct. 24, 2017) (citations omitted).  In such circumstances, "the non-movant must be given a limited opportunity to conduct discovery on the narrow issue of whether an arbitration agreement exists." *Ross v. CACH, LLC*, Civ. No. 14-6321, 2015 WL 1499282, at *2 (D.N.J. Apr. 1, 2015).  Afterwards, "the court may entertain a renewed motion to compel arbitration, this time judging the motion under a [Rule 56] summary judgment standard." *Guidotti*, 716 F.3d at 776.

Here, the Complaint makes no reference to Robina's Arbitration Agreement, nor is it attached as an exhibit.  Defendant raises this issue for the first time in its Motion to Dismiss and attaches a copy of the relevant document to its Motion.  ("AGREEMENT TO ARBITRATE (USA)," attached as Exhibit A, ECF No. 17-5.")[1]  Given that the question of arbitrability cannot be resolved without considering the arbitration agreement, which constitutes evidence extraneous to the pleadings, it would be inappropriate to apply a Rule 12(b)(6) standard in deciding the instant motion.  *See Guidotti*. 716 F.3d at 774.  As the Third Circuit instructed in *Guidotti*, in this type of scenario, "the motion to compel arbitration *must* be denied pending further development of the factual record."  *Id.* (emphasis added); *see, e.g., Sauberman v. Avis Rent a Car Sys., L.L.C.*, Civ. No. 17-756, 2017 WL 2312359, at *2 (D.N.J. May 26, 2017) (denying a motion to compel arbitration and ordering limited discovery where the complaint did not establish on its face that the parties agreed to arbitrate); *Torres v. Rushmore Serv. Ctr., LLC,* Civ. No. 18-9236, 2019 WL

---

[1] Notably, although an arbitration agreement is attached to Defendant's Motion and is accompanied by a sworn affidavit, it neither names Plaintiff Robina as a party to the agreement nor is it executed by the parties in this suit. Accordingly, the Court finds that further discovery and briefing on this issue is warranted.

5669175, at *2 (D.N.J. Oct. 31, 2018) (same); *Hughes v. Kolaras*, Civ. No. 13-0057, 2013 WL 5797735, at *7 (D.N.J. Oct. 28, 2013) (denying a motion to dismiss without prejudice in part because arbitrability was not apparent on the face of the complaint); *Divoc 91, LLC v. Nat. Essentials, Inc.*, Civ. No. 22-249, 2023 WL 2625275, at *3 (D.N.J. Mar. 24, 2023) (denying motion to compel arbitration and stay proceedings because the plaintiff's complaint "ma[de] no reference to whether the parties *agreed* to arbitration") (emphasis in original).  Thus, this Court will deny Defendants' motion without prejudice, and order the parties to conduct limited discovery on the issue of arbitrability.  Afterwards, Defendants may file a renewed motion to compel arbitration, which this Court will review under a Rule 56 standard.  Insofar as Plaintiff Robina's participation in this suit first depends upon whether he is properly bound by a valid arbitration agreement, the Court does not address his standing or whether he pleads plausible claims for relief.

      **B.**      **PLAINTIFF MANTAGAS' STANDING**

Defendant initially argues that Plaintiffs lack Article III standing because they have not alleged an "actual" or "imminent" injury-in-fact, and because Plaintiffs have not established that any injury from the Data Breach is fairly traceable to Defendant.  (Moving Br. at 7–12.) Specifically, Defendant argues that an increase in volume of spam calls and fraudulent credit card charges do not suffice as concrete injuries. (*Id.* at 7–8.)  They contend that Plaintiffs' "heightened and substantial risk of identity theft . . . for the rest of their lives" is too speculative to establish a future injury. (*Id.* at 11.)  Lastly, Defendant argues that, even if the Court concluded that any of the plaintiffs suffered harm, Plaintiffs nonetheless fail to allege that their injuries were traceable to Defendant because "Plaintiffs' alleged increase in spam calls and fraudulent credit card charges occurred *after* the breach does not mean they happened *because of* the breach." (*Id.* at 13) (emphases in original).

Article III limits federal courts' jurisdiction to actual "cases or controversies." U.S. Const. art. III, § 2. This requirement places the burden on plaintiffs to establish their "standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). At the pleading stage, Article III requires a plaintiff to allege facts showing (1) an "injury in fact;" (2) a causal connection between that injury and the conduct complained of; and (3) that such injury will likely be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Each named plaintiff in a class action must personally demonstrate standing independently of any claims brought on behalf of a putative class. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996).

The Court addresses each element of Article III standing in turn.

1. <u>Injury-in-Fact</u>

The injury-in-fact requirement contains two core components. First, an alleged injury must be "concrete in both a qualitative and temporal sense." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3rd Cir. 2011) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). More specifically, a plaintiff "must allege an injury to himself that is 'distinct and palpable,' as distinguished from merely 'abstract,' and the alleged harm must be actual or imminent, not 'conjectural or hypothetical.'" *Id.*; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Second, an injury must be "particularized," in that it "affect[s] the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992).

"[C]ertain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). "However, even intangible harms that are hard to quantify can be sufficiently 'concrete' to establish an injury-in-fact." *In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.*, Civ. No. 19-2904, 2021 WL 5937742, at *6 (D.N.J. Dec. 16, 2021). The Supreme Court recently explained that to determine whether an intangible harm

presents a constitutionally recognized injury, federal courts must analyze whether an alleged harm bears a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204; *see also Spokeo*, 578 U.S. at 341.

In *TransUnion*, the Court considered whether a class of plaintiffs whose credit reports were misleadingly marked as presenting a risk by the Officer of Foreign Assets Control ("OFAC") had suffered an Article III injury. *TransUnion*, 141 S. Ct. at 2208.  The Court held that the 1,853 class members whose credit reports were disseminated to third-party businesses with misleading information—though they did not necessarily suffer direct economic injury—had suffered a harm that bore a "close relationship" to the reputational harm associated with the tort of defamation. *Id*. On the other hand, the Court found that the remaining 6,332 class members did not suffer an injury because although their credit files contained misleading information, the misleading OFAC alert was not sent to a third-party. *Id.* at 2209.  The court again analogized to defamation and reasoned that because "[p]ublication is 'essential to liability' in a suit for defamation," those plaintiffs' failure to establish that the misleading alert was transmitted precluded standing. *Id*.  The Court rejected the argument that the mere existence of the misleading credit file was itself sufficient for injury because of the hypothetical risk that it could be sent to third-parties in the future.  Absent factual support that this risk "materialized," the remaining plaintiffs failed to establish standing. *Id*. at 2212.  Thus, the Supreme Court's decision in *TransUnion* reaffirms that a "mere risk of future harm," divorced from actual harm, is insufficient to support standing in a suit for damages. *Id*. at 2211

Given the intangible harms inherent in having one's personal information compromised, plaintiffs in information security and data privacy cases raise unique issues with respect to standing.  Generally, a plaintiff in a data breach case can establish standing through allegations

12

tending to show that his or her individual information has actually been accessed, disseminated, or misused by an unauthorized party. *See, e.g., In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 639 (3d Cir. 2017). On the other hand, speculation that a plaintiff's data "may have been accessed" in a large data breach is insufficient. *Reilly*, 664 F.3d at 43. In *Reilly*, the Third Circuit considered whether plaintiffs suffered an injury when an unknown third-party wrongfully accessed a server containing their electronically-stored information, but no facts suggested the third party had read, copied, understood, or used that information. *Id*. at 42. The court decisively answered that question in the negative, reasoning that "[a]llegations of possible future injury are not sufficient to satisfy Article III." *Id.* (finding no standing based on the "indefinite risk of future harms inflicted by unknown third parties"). "In other words, the fact that some plaintiffs' [p]ersonal [i]nformation may have been accessed and misused does not necessarily create a particularized injury as to all [the p]laintiffs whose data was in AMCA's possession." *In re Am. Med.*, 2021 WL 5937742, at *7 (citing *In re Horizon*, 846 F.3d at 641 n.22 (explaining that the "particularization requirement may impose limits on the ability of consumers to bring suit" based on "generalized grievances")); cf. *TransUnion*, 141 S. Ct. at 2212.

   Still, once a plaintiff satisfies his burden to allege facts suggesting the actual dissemination of his personal information, he may establish standing without an additional showing of direct economic injury. *In re Am. Med.*, 2021 WL 5937742, at *7. Indeed, when it comes to "laws that protect privacy, a focus on economic loss is misplaced." *In re Horizon*, 846 F.3d at 636 (citation and internal quotation marks omitted). Rather, the unauthorized disclosure of personal information itself constitutes "a clear *de facto* injury." *Id*. (italics in original). In *In re Horizon*, the Third Circuit held that because privacy torts at common law recognize improper dissemination as a cognizable injury, "the unauthorized dissemination of personal information" causes "an injury in

13

and of itself—whether or not the disclosure of that information increase[s] the risk of identity theft or some other future harm." *Id*. at 639.

The Complaint alleges that "subsequent to the Data Breach, Plaintiff Mantagas experienced an increase in the number of spam phone calls, emails and texts, in particular emails related to payday loans and that he "spent time dealing with these suspicious communications and monitoring his financial accounts for suspicious activity." (Compl. ¶ 111.)

The Complaint alleges no other facts to support an inference that his particular information was accessed, stolen, or misused. He instead seeks to establish an Article III injury based on (1) an increased risk of future identity theft; (2) expenses incurred to prevent future identity theft; (3) the allegedly diminished value of his Personal Information; and (4) a lost "benefit of the bargain" regarding Defendant's security measures. None of these provides a sufficient injury-in-fact. Notably, unlike Plaintiff Robina, he has not alleged that he was a victim of fraudulent credit card charges, nor has he pled any other particularized facts that would corroborate a fear of identity theft. Mantagas' alleged injuries are the type of speculative harm that the Third Circuit squarely rejected in *Reilly*. 664 F.3d at 46. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Moreover, courts in this circuit have consistently held that injuries in the form of spam calls and the fear of speculative future harm are not enough to establish an injury-in-fact. *See In re Am. Med.*, 2021 WL 5937742, at *8–9; *Gaddy v. Long & Foster Cos,* Civ. No. 21-2396, 2022 LEXIS 46657, at *9 (D.N.J. Mar. 15, 2022).

Defendant seeks dismissal of Plaintiff Mantagas' claims for lack of standing but, importantly, given that Defendant removed this matter to this Court, the proper remedy would be

14

remand rather than dismissal. *See Katz v. Six Flags Great Adventure, LLC*, Civ. No. 18-116, 2018 WL 3831337, at *8–9 (D.N.J. Aug. 13, 2018) (remanding CAFA suit due to lack of standing and the explicit requirement under 28 U.S.C. § 1447 that "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded.") (emphasis in original). The case, however, is not ripe for remand insofar as an issue remains as to whether Plaintiff Robina is bound by an arbitration agreement. Accordingly, the Court will STAY Plaintiff Mantagas' claims pending a determination as to the arbitrability of Plaintiff Robina's claims.

## V.  CONCLUSION

For the reasons stated above, the Court will GRANT-IN-PART and DENY-IN-PART Defendant's Motion to Dismiss as follows:

Defendant's request to compel Plaintiff Robina to arbitration will be DENIED WITHOUT PREJUDICE; the parties shall conduct expedited discovery related solely to that issue for 30 days following the issuance of this decision; Defendant may file a renewed Motion to Compel Arbitration by October 13, 2023, to be made returnable November 6, 2023; and

Plaintiff Mantagas' claims will be STAYED pending a determination as to the arbitrability of Plaintiff Robina's claims; and

Defendant's Motion will otherwise be DENIED.


Date: **August 31, 2023**

                                   s/ Zahid N. Quraishi
                                   **ZAHID N. QURAISHI**
                                   **UNITED STATES DISTRICT JUDGE**